Good morning, may it please the court, Hanny Ficuri of Federal Defenders of San Diego, on behalf of the defendant and appellant, Ruben Alcazar-Bustos. Your honors, the district court erred in finding Mr. Alcazar-Bustos could demonstrate no prejudice from the flawed deportation hearing and improperly denied his motion to dismiss the indictment pursuant to Title 8, Section 1326, Subsection D. And the reason the district court erred was because it found there was no plausible grounds for relief from Mr. Alcazar-Bustos when in reality the opposite was true. And how do we determine whether it's true that it was plausible that he could have been granted relief? How would you go about determining the answer to that? Well, Your Honor, I think we can go about that by looking to see whether, first and foremost, was Mr. Alcazar-Bustos eligible for a form of relief? And secondly — No, we're talking about that we've gotten over that part now. Certainly. We're talking about whether it would be plausible that he could have been granted relief. I think plausible just means that there is some chance. At least that's the way I would urge this Court to interpret that word. There's some chance. And eligibility is certainly a part of that. But also, is there some equity in the record that this defendant or alien at the time of the removal hearing could demonstrate to an immigration judge that would warrant it to exercise its discretion? Well, one way you could try to go about that is to say, here are Ninth Circuit cases which would tell you that it's plausible. Another way would be to say, here is what the BIA has done in similar cases. A third way is to say, well, what's plausible? To me, this is plausible. So are there any Ninth Circuit cases to give us the answer? Certainly, Your Honor. There is. I cited in a 28-J letter that I filed on Friday to an unpublished Ninth Circuit case that's Vassallo-Martinez. And I think what's important about that case is that not only is it a Ninth Circuit case, but it actually refers to BIA cases affirming grants of voluntary departure to individuals that do have criminal records similar to Mr. Alcazar. So, for example, one case cited in Vassallo-Martinez is Enri Gonzalez-Figueroa, which is a BIA case. And in that case, the BIA affirmed an immigration judge's grant of voluntary departure to an alien who had four convictions for assault and had served six months in prison on the last assault conviction. But in that case, weren't the equities much stronger than Mr. Alcazar's? I would say that there were similar equities, Your Honor. I think there were equities in the sense that both had ties to the United States, both had citizen family members, both had no aggravated felony convictions. And I know that is a prerequisite, but it's also something that should be considered because Congress is specifically writing the voluntary departure statute as it is and explicitly eliminating, you know, a good moral character requirement and requiring no aggravated felony convictions. I said, look, to individuals who do have criminal records, even though they may have criminal records, as long as they don't have an aggravated felony conviction, and at least in terms of the discretionary balancing of the equities, at least as long as there is some equity in the record, relief is certainly plausible. But your defendant, there's no question that the district court, in my judgment, overstated his record. The notion of a lengthy criminal history with multiple gun convictions, I believe is the way the district court described it. This guy is 19. He's had two gun charges within two years of one another, both possession. One that triggered this was an unloaded weapon in a hotel room. So lengthy criminal record, multiple gun charges. But on the other side, all he has for his life is he lived in this country since he was, what, two months old, has a wife and a child. In other words, that's the only countervailing factor on that side. And that, if you distill that from this record, everything is plausible. Well, Your Honor, I think that at least with respect to one of the positive equities you referenced, which was the wife and child, I think it's important to note that first it's a citizen, a U.S. citizen wife and a U.S. citizen child. But secondly, this court has explained and the BIA has explained that the equity of having immediate family members or children and spouses who are very important and a very strong equity that warrants granting of relief. It is a factor, but this is no job, no career, no education. It is really purely I've lived in this country for a long time. I have a wife and a child. And that's the difference between the Vassallo case that you mentioned where there was a guy, the guy had at least contributed to the society. I mean, ultimately, what does plausible mean? Certainly. Does someone in the world do this, you know, ruling your favor, or would you need more? Well, I think the record was sufficient for this district court to find that it was certainly plausible that Mr. Alcazar could have been granted that form of relief. I think, again, you know, one of the things the government had noted in its briefing before both the district court and I think in this court is that voluntary departure is a very, there's a lot of discretion afforded to immigration judges. And as much as an immigration judge may say, well, this person's equities don't outweigh his criminal record, another immigration judge may very well have come to the opposite reasoning. And I think that's part of this district court's error in only assuming it was going to go negatively against Mr. Alcazar. But you have to analyze this as if you had drawn the best panel instead of the worst, because it would be plausible that you could get a good immigration judge from your standpoint. Well, certainly, Your Honor. And I think even when you look at what this immigration judge told Mr. Alcazar, Bustos. Well, he said good luck. You know, he said goodbye and good luck. Well, he did say that. But I think what's important to note, he also said that the original ground of deportation was that Mr. Alcazar Bustos had committed a crime involving moral turpitude, and the immigration judge did not sustain that ground and, in fact, explicitly said, well, I don't find that this is a crime involving moral turpitude. I find that this is a regulatory offense, and then proceeded to make the legal mistake, which was saying that this was an aggravated felony conviction. At that point, then, what that meant to this specific I.E.J. was that he had no discretion whatsoever to grant relief. Had he not made that mistake, it very well could have gone the other way for Mr. Alcazar Bustos, at least knowing that this I.E.J. had already found that the conviction was simply a regulatory offense. And, again, I think that goes back to the whole problem with the deportation hearing and the whole problem with the district court's analysis is that if the I.E.J. had not made that mistake and believed he had no power and no discretion whatsoever to grant Mr. Alcazar Bustos relief, he very well may have come out the other way had he known all of the equities that did exist. Certainly, the equities aren't as strong as some of the other defendants I had cited to in my papers. For example, Ubaldo Figueroa, the defender, there certainly had stronger equities, but I would urge this court to find that any difference in equity is made up in the different forms of relief the aliens were seeking. Voluntary departure is a limited form of relief. It certainly, you aren't deported and you don't have those bans from coming back into the United States or reapplying for admission, but it's not the same as getting a 212C relief, for example, where a person is permitted to remain in the United States with permanent resident status and basically invalidate their deportation with the remainder of my time. What do we do with the gang allegation, which he apparently doesn't contest in the pre-sentence report on the state charge, and he doesn't contest that? That can't count on the good side. That fact isolated, I would agree with Your Honor, that can't count towards the good side, but I think when you read the pre-sentence report as a whole, there were comments in there that said he had given up that lifestyle. He had certainly made poor choices and made mistakes as a youth, but he had effectively learned from those mistakes. It said during the pre-sentence report that he had stopped drinking, had stopped using drugs, had put the gang lifestyle behind him, because it basically put him in that situation he was in. And I think had the IJ taken the time to get to know those things, he very well may have gone the other way. And Your Honor, with the remainder of my time, I'd like to reserve the rest of my time for rebuttal unless there are any further questions. Thank you. All right. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. The district court in this case reached the correct conclusion that this defendant could not carry his burden of proving prejudice. And as the panel has pointed to, the only issue in this case is prejudice. Now, what we would define as prejudice has already been indicated by this court. We cited authorities, United States v. Sertapenia, Rangel Gonzalez, and R.C. Hernandez for the proposition that it can't just be some chance, as my opponent says, some mere possibility. The phrase that is repeatedly used in those cases is some likelihood. Now, what this court has already held before is, and the parties are not in dispute, the defendant doesn't show that he actually would have had to show or that he actually would have received it. The possibility cannot be something so simple as a mere chance. And, in fact, that's a necessary inference from United States v. Ortiz-Lopez. I believe that's this Court's only published case directly from the fast-track voluntary departure context. In many ways, it's on a similar procedural footing with this case. In Ortiz-Lopez, the I.J. erroneously found a conviction for one simple possession, one simple drug possession, to be an aggravated felony, and therefore did not entertain any inquiry into fast-track voluntary departure. In finding that to be error, I think it's notable this Court remanded to the district court to evaluate prejudice in the first instance. And, in fact, cited to, I believe, Gonzalez-Valerio, it's the same authority relied upon by the district court in this case, which is that the government should be given a chance to induce evidence to show that it wasn't plausible. Now, if a mere possibility were enough, I would submit that Ortiz-Lopez would not have been decided the way it was. By remanding and asking to look at the facts of the defendant's life, that is the kind of thing that has to happen. That's exactly what happened here. Now, when you read the briefing below, and I think there's also this undercurrent through the defendant's briefing, it seems to indicate that once he has statutory eligibility, it's a total free-for-all. That's not the case. In fact, Judge Reinhardt and Campos-Granillo, you wrote that even though I.J.'s have wide discretion in this area, it's not without guideposts. And the most significant authority we, the government, would point the Court to is a BIA case from 1999, In re Arguellas-Campos. That is the BIA's seminal decision on the differences between pre-conclusion and post-conclusion voluntary departure. And what the BIA says is that even though good moral character, which is a term of art, doesn't have to be shown for the pre-conclusion voluntary departure, the alien still has the burden of proving his worthiness as a matter of discretion. And then the BIA goes forward to set out factors, and what it does, it basically reincorporates by reference the pre-arrea factors first set forth in Matter of Gamboa by the BIA in 1972, then reiterated by this Court in Campos-Granillo, and those are the factors that you have to analyze the case through. And that's exactly what the district court purported to do. But what – it's almost as if there's a continuum. On the one hand, can you say on this record no way, that there's no way he would have had – he would have gotten this relief? I can't, Your Honor, but I don't think that hurts the government's position because my not being able to see there's no way is simply my recognition that there's a chance. But again, it's the government's position that a simple chance in and of itself is not enough. So plausible means more than just there's a chance. Right, more than just possible. There has to be some likelihood, and that's again why we cite to Sertipenia, Rangel, Gonzalez. If you take your brother's argument, is it likelihood in the abstract, or is it likely that this I.J. would have given relief? Well, I think it's a little both. I mean, I think it's a likelihood because obviously we don't know who the I.J. is. It's the likelihood based on his factors, his equities. I have the same question because the real question is, is it how his equities compare to an abstract standard, or do we think that the specific hearing would have gone differently if the I.J. had gotten it right? For instance, the I.J. in the transcript, which I found very interesting, he said what he was looking for. He had three things that he was looking for. I want to know what your immigration record is. Have you been removed before? Have you been voluntarily returned to your native country before by the government? I want to know if you've been in jail. I want to know if you have any immediate family in the United States that are here legally, et cetera. He seemed to have set out his own individual standards as opposed to just simply looking at the equities of the case. But I'm wondering what that does with the question of plausibility here because he had his own set of standards. Well, I'd come right back with this. Those set of standards are exactly the ones that the BIA said that the I.J. should apply in Arguellas-Campos. I think the important thing to keep in mind here, this I.J. wasn't pulling these out of thin air, and he certainly wasn't without legal foundation. In fact, at page 817 of Arguellas-Campos, the board specifies the factors that should be weighed in exercising discretion and points to the nature and underlying circumstances of the deportation grounded issue, additional violations of the immigration laws, that's what the I.J. has spoken of, the existence, seriousness, and recency of any criminal record. And that's when he asked about jail time. You're talking about the one of the categories you mentioned is the recency, seriousness, or whatever the frequency may be of the violation of the immigration laws. What about somebody who doesn't really ever consciously violate the immigration laws, who just happens, his parents bring him in when he's two months old and he spends his whole life in the country? What weight do you give to that as opposed to somebody who either crossed deliberately at an older age or crosses regularly? The person has no control. He's two months old, and he didn't really come here intending to come. He didn't try to avoid any immigration laws. He's lived his whole life in the country. What weight do you give to that? Well, that would be a factor in the defendant's benefit. I think when the BIA in Arguellas-Campos does say look to other immigration violations, the specific language about existence, seriousness, and recency referred to criminal record, because I'd say, look, you can't just close your eyes at that point. Sure, if he comes over two months old, he has no choice. But then when he engages in five criminal acts in five years, leading up immediately. As a teenager. Right. Your Honor, a teenager who was in a gang with admitted substance abuse. Now there are lots of people who are in gangs, grow up, become good citizens. If everybody who was once in a gang was judged a bad person, we'd have terrible problems. We have terrible problems anyway. But we have even worse problems. I would assume that's so. But I think the important thing to keep in mind, Your Honor, perhaps you and I can differ as to this. The important thing is what does the BIA look at? Well, the question is, again, are you looking at the – taking Judge Nelson's question, are you looking in the abstract or are you looking at this hearing? To what degree does this I.J. not think about the issues that we're talking about here because he thought the guy was an aggravated felon and was – and therefore not – because he made the wrong decision that he was an aggravated felon and therefore not open to the pre-conclusion voluntary departure. So – Your Honor, I don't – So is the standard what he would have done? Because he didn't do much because he figured the inquiry was over. Sure, but that – Or is the standard what somebody else would have done? No, I think it's still – I would say it's what a reasonable I.J. would do. Look, every one of these cases – Are there unreasonable I.J.s? Perhaps there might be. It's no different than the harmless error review. We ask what a rational juror would do. You have to assume at this point – we already know when errors happen. Except it's the plausibility standard. You couldn't imagine a lower standard, right? Not reasonable probability, not no way, plausible. I can imagine a lower – possible. Okay. Because plausible to me means believable. There has to be something more than just mere possibility. If that were the case, we wouldn't – 10 percent of our workload in the Southern District would be gone because – But there's a particular – That would help quite a margin. It wouldn't be good for my job security, but maybe it would help you guys. Also, what do you say – I mean, this is a young guy. This is a guy who's 19. So all the cases that talk about been in this country for 9,000 years and have this fabulous record, he didn't have much time to do anything more than, you know, have a baby, have a wife. How do you weigh in his age? He gets in trouble, gets in trouble again, you know, immediately when he's released from juvenile – or he's on juvenile probation and gets in trouble. Released on bail, gets in trouble again. How do you weigh that? He can't have a countervailing life very much because he's only 19. Well, true. But he could have been – He doesn't endear himself to this society. Exactly. I mean, he could have been a teenager who had only done one of those things. And I would, you know, take issue. I know Your Honor stated earlier you thought the district court overstated the record. When you look at here, this was a steady progression. I mean, you've got battery, burglary, 38 months probation, 45 days juvenile hall. The next year, auto theft, 180 days juvenile hall. The next day, unauthorized possession of a firearm. I think it's important to keep in mind the state actually tried him as an adult. Under California Welfare and Institutions Code 707, that is a huge hurdle. You almost have to think that somebody is beyond redemption or rehabilitation in order to do that. And he gets 36 months of hard time. And the other thing I keep in mind, you know, he gets married two years. He gets married in 2005. He still incurs two more convictions after that. His baby is born in September of 2006. He only spends one month of the child's life free of custody. So, you know, if somebody wants to raise the factors of the child having a wife, I'd say this didn't change his conduct. And when you look at, again, I mean, firearms, again, even if it's mere possession, in conjunction with all the other factors. Even Judge Reinhart said in Campos-Granillo, when you look at the factors. Am I a plausible I.J. for this case? I knew I'd come in under a little more scrutiny here. But, you know, I think, again, when you look at the factors, and one thing you had pointed out, too, we have to look at what the BIA has done and what the Ninth Circuit have done. This record, this criminal record leading up to this, there was no evidence of rehabilitation. I know my opponent cited Vassallo-Martinez, and he points to some of the cases that were cited in that opinion. The first one he talked about, I believe it was Pineda-Gonzalez. That alien, unlike this alien, had shown extraordinary rehabilitation. He went through Alcoholics Anonymous when he was in jail. He induced witnesses who said that he doesn't drink anymore. And I believe Judge Nelson pointed out, too, that's why it's not enough. I mean, you have to look at the equities. You have to look at them, maybe not under a magnifying glass, but you have to give them some scrutiny. My opponent would say just because there's a handful of cases where the BIA has given fast-track voluntary departure to people with criminal convictions, that's the end of the story. But we'd say that's not true. When you look at those aliens, and, again, Vassallo-Martinez, he had his crimes were DUIs, which obviously are serious, but they're not crimes of violence under the law of this court. This defendant had several intentional crimes that had victims. Vassallo-Martinez pointed out that he had 17 years' work history. He had an automotive degree. He had even owned his own business, and he had attended the same church for 20 years, which I think goes to Judge Gertner's concern about service to the community. We're looking at the cases. These are the factors that they say are important. I'm not here to demonize this defendant. I'm just doing my job. But I'm saying even under the standards of the law that there are out there, is it plausible? Is it believable? I don't think so. And with the court's indulgence, just 30 more seconds. If the only three factors, the equities that this defendant pointed to were, one, the absence of an aggravated felony conviction, well, all that shows is that he's eligible to be considered. The other one is the length of residence. We cited case law from the BIA, and I believe the courts, that say even a lengthy residence, its weight is severely minimized when it's riddled with disrespect for the laws of the country and criminal behavior. That's what you have here. And finally, even though family ties, of course, are important, again, you look to see did it change the defendant's behavior. In this case, after the marriage, after the baby, still two convictions, and not just any old conviction, not driving without a license, you know, jaywalking, both with firearms. And even when he's on bail pending sentencing, he still is found with another firearm. All I'm saying is to a reasonable I.J., under the prism of the law that's out there, that's not plausible. Sure, is it possible? Could I win lotto if I buy 10 tickets today? It's possible. Is it plausible? I don't think so. Could you say one thing about the second firearm conviction? Was that he got a ride in the car with someone, and there was a firearm in the trunk? That doesn't ring a bell, Your Honor. I know he was on bail pending sentencing, and it was the conviction was possession of firearm against the terms of probation. And he had negotiated even a 16-month term. He got an 8-month term, which I think is important, too. I mean, that was something very serious as well. Let's end the panel. I appreciate the time. If you have any more questions, the government would submit. Thank you. We'll give you an extra minute or so if you need it. Thank you. Thank you very much, Your Honor. Yeah, I was going to say 48 seconds isn't a whole lot, but one thing that Mr. Rahe said was that he couldn't say definitively that there was no way that an I.J. would grant Mr. Alcazar relief. In my mind, that makes it plausible. Well, no one could ever say that. I mean, you can't say nothing's possible. I mean, he could have gone, as he suggested, but that's like me. Well, but I think when you combine that, however, with... But for me. Let's put this out. I think when you combine that with the fact that there are BIA cases out there that do affirm grants of voluntary departure for individuals who do have criminal records, I think it does make it plausible. I wanted to touch upon one comment that Judge Nelson mentioned, which was do we look at an I.J. in the abstract or do we look at it in a specific I.J.? And I think I would agree with Mr. Rahe that it's a little bit of both. It's a reasonable I.J., but I think what's particularly illuminating about this record is that we do know what this I.J. was going to consider, and we know that this I.J. was unable to give any consideration to any of the positive equities. I see my time's up. I'll just... He's going to have a moment. Thank you. Didn't give any consideration to any of the positive equities. In Campos-Granillo, this court stated that as much as an I.J. has to consider the negative factors, an I.J. also has to consider the equitable or good factors. And that goes back to Judge Gertner's point, which is that I think the age of Mr. Alcazar speaks volumes as to his criminal record. Did he have a criminal record? You're not looking at any good factors. The good factors are beyond him. The good factors are that he came here two months, he was here his whole life, and that he married an American citizen and has an American citizen child. It's nothing that he has done to show that he is a worthwhile person. He may well be, but there are no good factors that I'm aware of in his record. Well, Your Honor, respectfully, Your Honor, I would disagree with that. I think those factors... Tell me, what are the good things about his life that a judge should give weight to in deciding whether he should be given voluntary deportation? Well, I think, again, as the probation or the pre-sentence report made clear, he had basically told the probation officer he had disavowed his gang lifestyle. He had actually, and I was reviewing it just as Mr. Ahe was speaking, he was actually out on bail after the second arrest and turned himself into prison and turned himself in to serve his time. And basically, I think it had come to a crossroads where he realized, it's time to put this lifestyle behind me. I've got a wife and child I have to provide for. I think his age serves to mitigate his criminal record. It doesn't absolve him of it completely by any stretch of the imagination, but I think it does explain it to a certain extent. And I think that is also a positive factor. And lastly, I think it all goes back to the form of relief we're talking about here, which is voluntary departure. It's asking to leave the country. A lot of the cases, part of the problem, I think, is, as this court recognized in Vargas Hernandez, that the discretionary factors that you consider for voluntary departure are the same as for 212C and other forms of relief that are more beneficial because they permit an alien to stay. The equitable factors here were enough to permit Mr. Alcazar-Bustos to voluntarily depart. I'd ask the court to vacate the conviction. Thank you for your time. Thank you for the extra time. Thank you. Thank you. The case is derogated. It will be submitted. The next case on the calendar is United States.
judges: Gertner, Nelson D. W., Reinhardt